FILED
2009 Feb-19  AM 11:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **ALIREZA A. NASSERI,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 5:07-CV-946-VEH** |
| | ) |
| **CITY OF ATHENS, ALABAMA;** | ) |
| **FRED MILLWARD; and WESLEY** | ) |
| **LITTLE,** | ) |
| | ) |
| **Defendants.** | ) |

---

## MEMORANDUM OPINION

### I.   INTRODUCTION

Currently pending before the Court is the Motion for Summary Judgment (Doc. 17) filed by the Defendants in this case, the City of Athens, Alabama, Fred Millward, and Wesley Little, as to all claims of the Plaintiff, Alireza A. Nasseri. The parties have fully briefed the motion (Docs. 20, 22, 24) and it is now under submission to this Court. Upon consideration of the parties' arguments, and as explained in this Memorandum Opinion, the Defendants' motion is due to be **GRANTED**.

### II.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000).

The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(c) requires the nonmoving party to go beyond the pleadings and, by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023.

2

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(*en banc*)). If the moving party bears the burden of proof at trial, then it can meet its burden on summary judgment only by presenting positive evidence that demonstrates the absence of a genuine issue of material fact; i.e., facts that would entitle it to a directed verdict if not controverted at trial. *Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the nonmoving party must respond with positive evidence sufficient to resist a motion for a directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of any evidence in the record in support of a judgment for the

3

nonmoving party on the issue in question.  This method requires more than a simple statement that the nonmoving party cannot meet its burden at trial but does not require evidence negating the nonmovant's claim; it simply requires the movant to point out to the court that there is an absence of evidence to support the nonmoving party's case.  *Fitzpatrick*, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the nonmoving party may either point to evidence in the court record, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the nonmoving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the nonmovant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *Lewis v. Casey*, 518 U.S. 343 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## II.    FACTUAL AND PROCEDURAL HISTORY[1]

The Plaintiff, Alireza Nasseri ("Nasseri"), is a fifty-seven year old resident of Athens, Alabama who was born in Tabriz, Iran. (Doc. 19, Al. Nasseri Dep. at 8:14-

---

[1]  These are the facts for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts.") (citation omitted).

23.)   He is the father of three children, the oldest of whom is Abdul Nasseri ("Abdul").  (Doc. 19, Al. Nasseri Dep. at 11:20-23.)

On the evening giving rise to the events that precipitated this lawsuit, May 26, 2005, Nasseri arrived at the jail for the City of Athens, Alabama in order to bond his son, Abdul, out of jail.  (AF # 2.1.)[2]  At the jail, Nasseri first encountered the Defendant Wesley Little ("Little").  (Doc. 19, Al. Nasseri Dep. at 75:6-11.)  Little referred Nasseri to his supervisor, the Defendant Fred Millward ("Millward"), who promptly told Nasseri that they had no time to "mess with him."  (Doc. 19, Al. Nasseri Dep. at 77:1-4.)  The jail was understaffed at this time; there were only two to three officers in the entire facility.  (Doc. 19, Al. Nasseri Dep. at 78:19-21.)  Nasseri suggested that Millward call the police chief, who had, on a prior occasion, told Nasseri to call him if he had a problem with the officers at the facility.  (Doc. 19, Al. Nasseri Dep. at 77:10-14.)  Millward responded to Nasseri with foul language,

---

[2]  The designation "AF" stands for admitted fact and indicates a fact offered by the Defendants that the Plaintiff has admitted in his written submissions on summary judgment, in his deposition testimony, or by virtue of any other evidence offered in support of his case. Whenever Plaintiff has adequately disputed a fact offered by the Defendants, the Court has accepted Plaintiff's version. The Court's numbering of admitted facts (*e.g.*, AF # 1) corresponds to the numbering of the Defendants' Statement of Facts as set forth in Doc. 21 and responded to by Plaintiff in Doc. 22.  A number following a decimal point corresponds to the particular sentence within the numbered statement of facts.  For example, (AF No. 5.2) would indicate the second sentence of paragraph 5 of the Defendants' Statement of Facts is the subject of the Court's citation to the record. Similarly, the designation "AAF" stands for additional admitted fact and corresponds to Plaintiff's Statement of Facts contained in Doc. 22 and responded to by the Defendants in Doc. 23.  Any other facts referenced by the parties that require further clarification are dealt with later in the Court's opinion.

telling Nasseri to "get out of here," and "got very loud." (Doc. 19, Al. Nasseri Dep. at 77:16-17.) Nasseri returned to his seat to call a bondsmen. (Doc. 19, Al. Nasseri Dep. at 78-79.) As Nasseri began dialing, Millward grabbed Nasseri's hand, knocking him to the ground and then proceeding to sit on Nasseri. (Doc. 19, Al. Nasseri Dep. at 79: 4-19.) Another officer arrived and they punched Nasseri in the back a few times, handcuffed him and arrested him. (Doc. 19, Al. Nasseri Dep. at 79: 13-18.) Millward took Nasseri to the booking room and left him handcuffed in a chair. (AF # 3.) Nasseri's actual booking had not been completed. (Doc. 18, Millward Dep. at 183:22-184:2.)

At the same time, two other persons had been arrested and brought to the station: Solomon and Shellnut. (Doc. 18, Millward Dep. at 14:18-16:8.) After Millward brought the handcuffed Nasseri into the booking room, he went to discuss charges with Shellnut, who was in an adjacent room. (AF # 3.) Shellnut became enraged and attacked Millward, who quickly subdued Shellnut, but, while the two struggled, another officer, Wesley Jarrett ("Jarrett"), left the booking room to help Millward in the altercation. (AF # 3-4.) As Jarrett moved to assist Millward, Solomon attacked Jarrett from behind (Doc. 19, Jarrett Dep. at 45:18-21.); Little heard the commotion and hurried into the booking room. (AF # 4.) To assist Jarrett, Little deployed pepper spray on the prisoner. (AF # 5.) Jarrett had subdued the

prisoner at this point, but Solomon continued to scream and resist. (Doc. 19, Ab. Nasseri Dep. at 46:10-12.) Nasseri remained seated in his chair during this altercation, handcuffed, but upon smelling the pepper spray and believing that the situation was under control, Nasseri asked Little to "stop that mess." (Doc. 19, Al. Nasseri Dep. at 101:4-16.) Little then turned towards Nasseri, who remained seated, strode towards him and sprayed him directly in the face with the pepper spray at a very close distance–no more than one or two feet. (Doc. 19, Al. Nasseri Dep. at 103:5-10, 105:7-8.)

The blast lasted between ten and fifteen seconds. (Doc. 19, Ab. Nasseri Dep. at 48:12-18.) Millward was standing directly behind Nasseri at this point and witnessed the spraying. (Doc. 19, Ab. Nasseri Dep. at 49:7-18.) Nasseri began choking and coughing and was unable to breathe. (Doc. 19, Al. Nasseri Dep. at 105:16-22.) It would be typical for such a blast to leave an orange discharge on Nasseri's face. (Doc. 19, Little Dep. at 102:13-103:8.) After Little sprayed Nasseri, Millward and Jarrett began evacuating all prisoners, including Nasseri, from the jail in order to wait for the air to clear. (AF # 7.)

Millward placed Nasseri in a patrol car, while all of the other inmates (including the two who were involved in altercations with the officers) were placed outside, standing against the wall of the jail. (Doc. 19, Al. Nasseri Dep. at 114: 7-13.)

7

As Nasseri describes, Millward explained that he was putting Nasseri in the car because he was "going to take [Nasseri] to county" because he did not have room for him in the overcrowded jail.  (Doc. 19, Al. Nasseri Dep. at 111:12-20.)  As explained below, Millward ultimately did not take Nasseri to another facility.

After Millward placed the choking and gasping Nasseri in the patrol car, Nasseri began screaming and kicking the windows of the car, as well as trying to stick his head through an eight to ten inch opening in a rear window of the car.  (Doc. 18, Millward  Dep. at 47-48; Doc. 19, Nasseri Dep. at 124:10-17; Doc. 23, Parnell Dep. at 21:19-23.)  At this time, the situation outside the car was chaotic.  (Doc. 23, Parnell Dep. at 23:18.)  All of the prisoners were outside of the prison, unsecured, with few officers to maintain order and make sure that no one attempted to escape.  (Doc. 19, Jarrett Dep. at 29-30.)  The other prisoners were yelling and screaming.  (Doc. 23, Parnell Dep. at 31:10-11, 33:14-16.)  There were approximately eleven prisoners who were evacuated and allowed to stand outside.  (Doc. 19, Jarrett Dep. at 35:6-9.)  The inmates who were outside were being permitted to wash their faces off with a hose near the building.  (Doc. 19, Jarrett Dep. at 29:13-30:9.)

Nasseri himself continued to scream throughout this time asking for medical help, and Millward heard Nasseri screaming, but Millward did not understand why Nasseri was screaming.  (Doc. 18, Millward Dep. at 146:10-147:6.)   Millward

8

returned to the car twice, and at one point, he closed the window that separates the front and rear portions of the car.  (Doc. 19, Al. Nasseri Dep. at 118:14-119:19.)

Nasseri called for help throughout the time that he was in the vehicle.  (AF # 9.)  Nasseri remained in the car for at least an hour.  (Doc. 19, Nasseri Dep. at 115:11.)  Millward was aware of Nasseri's screaming and the fact that he had been sprayed with mace; he told Nasseri's son, Abdul, that his father would "be okay because they had the air conditioner blowing." (Doc. 19, Ab. Nasseri Dep. at 55:5-8.) Later, Millward could not recall whether the air conditioner was running. (Doc. 18, Millward Dep. at 78:19-22.)

When Nasseri was finally removed from the car, all of the cells were filled, and he was forced to sleep in the hallway, without a blanket or mattress.  (Doc. 19, Al. Nasseri Dep. at 125:18-23.)  Millward would have been responsible for providing a mattress or blanket, which the jail had in ready supply.  (Doc. 18, Millward Dep. at 217:12-218:5.)

Nasseri repeatedly complained of breathing problems to Millward and requested medical care during the booking process, but Millward did not provide it. (Doc. 19, Al. Nasseri Dep. at 135:20-136:8.)  At this point, Nasseri's head was swelling, he was coughing and his handcuffs were so tight that they caused bruising. (Doc. 19, Al. Nasseri Dep. at 135:11-19.)

As a result of his prolonged exposure to the pepper spray without any decontamination, Nasseri developed Reactive Airway Disfunction Syndrome (RADS). (Doc. 23, Scherff Dep. at 46:18-48:23.) This syndrome causes coughing, chest discomfort on a daily basis, and requires a burdensome medication regimen. (Doc. 23, Scherff Dep. at 72:12-19.)

Nasseri initiated this case on May 22, 2007, against the City of Athens, Millward, and Little. (Doc. 1.) Brought under Section 1983, the Complaint alleged that the Defendants violated Nasseri's constitutional rights by unnecessarily using pepper spray and by refusing to provide him with medical care following Little's use of pepper spray. The Defendants filed their Motion for Summary Judgment (Doc. 17) on October 17, 2008. The parties have fully briefed all of the issues (Docs. 20, 22, 24) and this Motion is now under submission to the Court.

## III.   ANALYSIS

### A.   Abandoned Claims

In his Response in Opposition (Doc. 22), Nasseri agreed to the dismissal of his claims against the City of Athens and to the dismissal of the deliberate indifference to serious medical needs claim against Little. (Doc. 22 at 1.) Therefore, the only remaining claims before the Court are the excessive force claims against Millward

and Little, and the deliberate indifference claim against Millward.[3] The Motion for Summary Judgment is consequently due to be **GRANTED** as to all claims against the City of Athens, and as to the deliberate indifference claim against Little. *See Reid v. SmithKline Beecham Corp.*, 366 F. Supp. 2d 989, 993 (S.D. Cal. 2005) (granting summary judgment in case where plaintiff expressly abandoned several causes of action in her brief in opposition).

**B. Qualified Immunity**

The only remaining claims in this case are the Section 1983 claims brought against Millward and Little in their individual capacities. Therefore, a discussion of qualified immunity is appropriate. "The defense of qualified immunity completely

[3] Nasseri's Complaint (Doc. 1) is a "shotgun pleading" and lists only one countagainst all defendants. The Complaint only vaguely describes the manner in which the Defendants violated Nasseri's Constitutional rights. The Complaint alleges that the Defendants violated Nasseri's rights under the Fourteenth Amendment. (Doc. 1 at ¶ 37.) However, in his brief in opposition to Defendants' Motion for Summary Judgment, Nasseri claims that the Fourth Amendment applies to his excessive force claims (Doc. 22 at 8), while the Defendants contend that the Fourteenth Amendment applies because the defendant stated that he was a pretrial detainee under in his sole count (Doc. 24 at 1.) While "[a] district court may not infer claims other than those that plainly appear on the face of the complaint to defeat a defense of qualified immunity," *GJR Investments, Inc. v. County of Escambia, Fla.*, 132 F.3d 1359, 1369 (11th Cir.1998), under the facts of this case it is not impermissible for this Court to apply the Fourth Amendment rather than the Fourteenth Amendment to the conduct at issue. As discussed below, whether the Fourth Amendment applies to this conduct is a close legal question that enters into territory not yet decided by the Eleventh Circuit. The allegations of the Complaint make clear that Nasseri seeks to recover for an excessive force claim. Even though Nasseri drew the legal conclusion in his Fourteenth Amendment claim that he was a pretrial detainee, the Defendants were on notice that the Fourth Amendment may apply, given the excessive force allegations. (Doc. 1, ¶ 37-42.) In any event, for reasons discussed below, the Court finds that regardless of which amendment is considered, the Defendants are entitled to summary judgment.

protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003) (internal quotation marks and citations omitted). "To receive qualified immunity, a government official first must prove that he was acting within his discretionary authority." *Id.* at 1357-58.

This is a two-part test. Under the first step, "the defendant must [prove that he or she was] performing a function that, but for the alleged constitutional infirmity, would have fallen within his legitimate job description." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004). Next, the defendant must prove that he or she was "executing that job-related function." *Id.* at 1267.

Here, there can be no doubt that performing an arrest and maintaining discipline at a jail are within the legitimate duties of being a police officer. *See Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (finding that "there can be no doubt" that an officer acted in his discretionary capacity when making an arrest); *Danley v. Allen*, 540 F.3d 1298, 1306 (11th Cir. 2008) (finding that jailers were acting within discretionary authority when they administered pepper spray to a plaintiff). Furthermore, neither the Plaintiff nor the Defendants addressed the discretionary function issue in their briefing, and the Plaintiff appears to have

12

conceded that the Defendants were performing a discretionary function by engaging in a full qualified immunity analysis. Thus, the Court finds that Little and Millward were acting within their discretionary authority. "Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity." *Cottone*, 326 F.3d at 1358.

The Supreme Court has, until recently, required a two-part inquiry to determine the applicability of qualified immunity, as established by *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Under the *Saucier* test, "[t]he threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002). If, under the plaintiff's allegations, the defendants would have violated a constitutional right, "the next, sequential step is to ask whether the right was clearly established." *Cottone*, 326 F.3d at 1358 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The "clearly established" requirement is designed to assure that officers have fair notice of the conduct which is proscribed. *Hope v. Pelzer,* 536 U.S. 730, 739 (2002). This second inquiry ensures "that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier v. Katz,* 533 U.S. 194, 206 (2001). The "unlawfulness must be apparent" under preexisting law. *Anderson*

13

*v. Creighton,* 483 U.S. 635, 640 (1987).

This rigid framework was recently made non-mandatory by the Supreme Court in *Pearson v. Callahan*, 129 S. Ct. 808 (2009), in which the Court concluded that, "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." Thus, "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*

Despite the Supreme Court's recent modification of *Saucier*'s analytical process, the substantive analysis remains unchanged; an officer is entitled to qualified immunity protection as long as he "could have believed" his conduct was lawful. *Hunter v. Bryan,* 502 U.S. 224, 227 (1991).  To deny immunity, Nasseri must affirmatively demonstrate that "no reasonable competent officer would have" acted as defendants did.  *Malley v. Briggs,* 475 U.S. 335, 341 (1986).  Despite the Court's new-found discretion in applying the *Saucier* framework, it nevertheless believes that the traditional two-step approach is appropriate in the instant case.  Thus, the Court first addresses whether a constitutional violation exists, before turning to whether either of the defendants are entitled to qualified immunity.

14

C.    **Excessive Force**

1.    Whether the Fourth Amendment or the Fourteenth Amendment
applies to the alleged conduct

As a threshold question, it is necessary to determine whether the conduct at issue is governed by Fourth Amendment standards or Fourteenth Amendment standards.  This is an open question of law in the Eleventh Circuit.

Separate legal standards apply to Fourth and Fourteenth Amendment Excessive force claims.  Because qualified immunity is not available in Fourteenth Amendment excessive force cases, this question is of primary importance to the case. *See Danley v. Allen*, 540 F.3d 1298, 1310 (11th Cir. 2008) ("[W]e have held that 'there is no room for qualified immunity' in Eighth and Fourteenth Amendment excessive force cases because they require a subjective element that is 'so extreme' that no reasonable person could believe that his actions were lawful.") (quoting *Johnson v. Breeden*, 280 F.3d 1308, 1321-1322 (11th Cir. 2002)).  First, in order to prove a constitutional violation under the due process clause of the Fourteenth Amendment, Nasseri would be required to satisfy the Eleventh Circuit's "shocks the conscience" test.  *See Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007).  However, if the Fourth Amendment applies to the disputed facts, the Court must apply the "objective reasonableness" test established by the Supreme Court in *Graham v. Connor*, 490

15

U.S. 386 (1989), which is determined from the perspective "of a reasonable officer on the scene, rather that with the 20/20 vision of hindsight." *Long v. Slaton*, 508 F.3d 576, 579 (11th Cir. 2008).

The application of the appropriate standard is a close question, since "[t]he precise point at which a seizure ends (for purposes of Fourth Amendment coverage) and at which pretrial detention begins (governed by the Fourteenth Amendment until a conviction) is not settled in this Circuit." *Hicks v. Moore*, 422 F.3d 1246, 1253 n. 7 (11th Cir.2005); *see also Burkett v. Alachua Cty.*, 250 Fed.Appx. 950, 953 (11th Cir. 2007) (citing *Hicks* and noting that the law remains unsettled). Further complicating the matter, when the Eleventh Circuit has issued a decision in similar factual circumstances, it has only <u>assumed</u> that the Fourth Amendment applies rather than explicitly holding so.

For instance, in *Hicks v. Moore*, the plaintiff was arrested after a dispute with her estranged husband; the arresting officer took the plaintiff to the station and turned her over to the custody of jailers for processing. 422 F. 3d at 1249. The plaintiff was placed in a holding cell, strip-searched and was later finger-printed, during which she believed that an officer groped her. *Id.* She later claimed, among other things, that her Fourth Amendment rights were violated when the officer groped her while she was finger-printed. *Id.* at 1251. Turning to whether the plaintiff had asserted a

Fourth Amendment violation, the court wrote:

> Plaintiff asserts protection under the Fourth Amendment standard, which is commonly an easier standard for a plaintiff to meet. At the time of the fingerprinting, Plaintiff had already been arrested, delivered to the Jail, and had begun-but not completed-the booking process. The original arresting officer had turned Plaintiff over to jailers, and he was not present during and did not participate in the events underlying the complaint. The precise point at which a seizure ends (for purposes of Fourth Amendment coverage) and at which pretrial detention begins (governed until a conviction by the Fourteenth Amendment) is not settled in this Circuit. We underline that Defendants never argue that the strip search or fingerprinting was separate from Plaintiff's seizure; so we will assume (for this case) Plaintiff was still being seized and-analyze the claim under the Fourth Amendment.

*Id.* at 1254, n. 7. Thus, even assuming that the Fourth Amendment applied to the disputed conduct, the Court held that the pertinent fingerprinting conduct was only *de minimis* force, at best, which did not establish a constitutional violation. *Id.* at 1254. Accordingly, the defendant was entitled to qualified immunity, as there was no constitutional violation. *Id.*

Similar to the decision in *Hicks*, the Eleventh Circuit again assumed away the question of whether the Fourteenth Amendment or the Fourth Amendment applied to the disputed facts in *Burkett v. Alachua County*. There, the plaintiff's son, Burkett, was arrested after he resisted an officer's attempt to detain him for a psychiatric evaluation. 250 Fed. Appx. at 951. Burkett was placed in a holding cell for nearly

17

four hours before he appeared before a judge and was ordered to undergo a mental health evaluation.  *Id.*  Several hours later, a shot was administered to sedate Burkett. *Id.* at 952.  When officers later arrived to his cell to check up on Burkett, he became involved in an altercation and was placed in restraints, but following the altercation he stopped breathing and was soon thereafter pronounced dead.  *Id.*

The plaintiff asserted that the officers violated Burkett's Fourth Amendment rights when they restrained him by using excessive force.  *Id.*  The Eleventh Circuit analyzed the claims under the Fourth Amendment, but in doing so it noted:

> [T]he district court analyzed Plaintiff's excessive force claim under the Fourth Amendment; and the Correctional Officers agree that, based on the timing of Burkett's arrest and booking, the district court's approach appears to be the 'most logical.' Because the Correctional Officers do not argue that Burkett's claim concerns acts separate from his seizure and do not challenge the district court's use of a Fourth Amendment analysis, we will assume-based on the circumstances of this particular case-that Burkett was still being seized; and we will analyze Plaintiff's claim under the Fourth Amendment.

*Id.* at 952, n. 5.  Applying the Fourth Amendment test, the court found that the officers did not violate Burkett's rights.  *Id.* at 953.

More recently in *Powell v. Barrett*, 541 F.3d 1298 (11th Cir. 2008) (*en banc*), the Eleventh Circuit only "assum[ed] that arrestees being booked into a jail or detention facility retain some  Fourth Amendment rights." *Id.* at 1314 (citing *Bell v.*

*Wolfish*, 441 U.S. 520, 588 (1979)).  The decision in *Powell* involved a class action by former detainees in the Fulton County, Georgia jail who challenged the jail's policy of strip-searching all persons involved in the booking process and entering the jail population for the first time.  *Id.* at 1300.

The *en banc* panel's decision specifically addressed claims by arrestees, who argued that the policy of strip-searching arrestees was unconstitutional.  Assuming that the arrestees retained some Fourth Amendment rights, and relying on the Supreme Court's decision in *Bell*, the court found that those rights were "not violated by a policy or practice of strip searching [each arrestee] as part of the booking process."  *Id.* at 1314.  While the decision in *Powell* addressed a jail's official policy, which is not at issue here, it is still relevant in that the Eleventh Circuit assumed that the Fourth Amendment applied to an arrestee who was being booked into jail.

When addressing disciplinary conduct further afield from the environment of a jail, the Eleventh Circuit has had no difficulty in applying the Fourth Amendment rather than the Fourteenth Amendment after a person has been apprehended by the police.  *See, e.g.*, *Garrett  v. Athens-Clarke-County, Georgia*, 378 F.3d 1274, 1279 (11th Cir. 2004).  In *Garrett*, the Eleventh Circuit rejected an argument by the defendants that the district court should have analyzed an excessive force claim under the Fourteenth Amendment when an arrestee died while in police custody.  The

19

arresstee had led the police on a long car chase and had attempted to fight an officer during his capture.  While restrained, he was pepper-sprayed and left to lie by a police car while waiting for an ambulance to care for other injuries.  *Id.* at 1278. The arrestee died before the ambulance arrived, and the plaintiff sued on his behalf.  *Id.*

The court analyzed the claims under the Fourth Amendment, although the Defendants argued that the Fourteenth Amendment should apply.  *Id.* at 1279.  In reaching this decision, the court wrote, "[t]he excessive force claims arise from events happening in the course of the arrest . . . . [and] although the line is not always clear as to when an arrest ends and pretrial detainment begins, the facts here fall on the arrest end." *Id.* at 1279, n. 11.  Applying the Fourth Amendment, the court found that there was no constitutional violation.  *Id.* at 1281.

The facts in the instant case are somewhere in between the cases in which the Eleventh Circuit only assumed that the Fourth Amendment applied and the cases in which the Eleventh Circuit explicitly found that the Fourth Amendment applied. Nasseri's arrest began while he was at the police station, and he was led to the booking room, but was never booked, before he was sprayed by Little.  Thus, at the time force was applied, Nasseri had not been subjected to the longer detentions seen in recent Eleventh Circuit cases in which the court only assumed that the Fourth Amendment applied.

Since the Eleventh Circuit has not provided specific guidance to this Court, it looks to the persuasive authority of other district courts.  Judge DuBose, district court judge for the Southern District of Alabama, recently addressed a similar situation.  *See  Stephens v. City of Butler*, 509 F. Supp. 2d 1098 (S.D. Ala. 2007).  In *Stephens*, the court encountered the same "legal twilight zone between the completion of the arrest as that term is commonly used and the beginning of pretrial detainment."  *Id.* at 1108.   There, the plaintiff was initially seized by an arresting officer at an apartment complex and taken to the jail of Choctaw County, Alabama.  The plaintiff was taken to the booking room by the arresting officer, whose responsibility it was to perform the booking procedure.  *Id.* at 1103.  During this procedure, the arresting officer repeatedly asked the plaintiff to put on his jail clothes, but the plaintiff refused.  *Id.* at 1104.  The officer then used a taser on the plaintiff at least four times.  *Id.*  The plaintiff was then taken to a cell where he changed into his jail clothes and requested medical care, but received none.  *Id.*  The plaintiff received second degree burns on his body from the taser.  *Id.*  Based on these facts, the court found that the Fourth Amendment applied to the tasing incident, as the arresting officer maintained custody of the plaintiff, and at the time of the incident the plaintiff had not been searched or fingerprinted.  *Id.* at 1110.

The district court's holding in *Stephens* also falls in line with the holdings of

several other circuit courts who have held that a person who remains in the custody of an arresting officer continues to be an arrestee rather than a pretrial detainee. *See, e.g.*, *Fontana v. Haskin*, 262 F.3d 871, 879-880 (9th Cir.2001) ("[T]he Fourth Amendment prohibition against unreasonable search and seizure continues to apply after an arrestee is in the custody of the arresting officers."); *Johnson v. City of Cincinnati*, 310 F.3d 484, 492 (6th Cir.2002) ("In this circuit, a "seizure" under the Fourth Amendment continues at least "throughout the time the person remains in the custody of the arresting officers."); *Gutierrez v. City of San Antonio*, 139 F.3d 441, 452 (5th Cir. 1998) ("the Fifth or Fourteenth Amendments begin to protect persons after the incidents of arrest are completed, after the plaintiff has been released from the arresting officer's custody, and after the plaintiff has been in detention awaiting trial for a significant period of time."); *Powell v. Gardner*, 891 F.2d 1039, 1044 (2d Cir. 1989) ("We think the Fourth Amendment standard probably should be applied at least to the period prior to the time when the person arrested is arraigned or formally charged, and remains in the custody (sole or joint) of the arresting officer.").

Based on the facts established for the purposes of the instant Motion for Summary Judgment, the Court finds that the principles of the Fourth Amendment apply to the conduct at issue. At the time that Nasseri was sprayed by Officer Little, he remained in the custody of the arresting officer, Millward, who had at that point

22

not even initiated the booking process.  That Millward was temporarily delayed while subduing another arrestee does not mean that Nasseri's arrest had ended and that he had begun to be detained pretrial.  As in *Stephens* and the circuit level cases cited in that decision, it is critical that Millward retained custody of Nasseri and that Nasseri had not been searched or fingerprinted.  It is clear that Millward retained custody of Nasseri, because Millward placed Nasseri in the back of a police car and told Nasseri that he would be taking him to the county jail, where there was more space to house Nasseri.  Thus, based on Nasseri's relatively short detention, Millward's continued control, and the fact that Nasseri had not been formally booked, the Court finds that Nasseri's excessive force claims should be analyzed under the Fourth Amendment rather than the Fourteenth Amendment.

Turning to the substantive component of the excessive force claims brought against Millward and Little, Nasseri argues that Little unreasonably applied force against him by using pepper spray and that Millward continued the application of force by failing to decontaminate Nasseri after he was sprayed and during his time in the car.  (Doc. 22 at 11-12.)  For the reasons discussed below, the Court finds that the Defendants did not violate Nasseri's constitutional rights and that, alternatively, the Defendants did not violate clearly established law.  The Court addresses the claims against each individual defendant separately.

2. <u>Little</u>

  a. *Little did not violate Nasseri's constitutional rights.*

 "The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002). "The 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004). "*Graham* dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight." *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002).

 "In making an excessive force inquiry, we are not to view the matter as judges from the comfort and safety of our chambers, fearful of nothing more threatening than the occasional paper cut as we read a cold record accounting of what turned out to be the facts. We must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal."

*Crosby v. Monroe County*, 394 F.3d 1328, 1333 (11th Cir. 2004) (citing *Graham*, 490 U.S. at 396-97; *Kesinger*, 381 F.3d at 1248-50; *Garrett*, 378 F.3d at 1279).

Nasseri argues that the current facts parallel the ones in *Lee v Ferraro*. There, the defendant arrested the plaintiff after a traffic stop and slammed the plaintiff's head into the trunk of her car after she was secured in handcuffs, although she did not resist arrest. 284 F.3d at 1191. The court found that, under the Supreme Court's test in *Graham*, there was a Fourth Amendment violation. *Id.* at 1199. The plaintiff, detained for not having a license, had not committed a serious offense, there was no threat to the officer, and there was no legitimate law enforcement reason to further subdue the plaintiff after she had already been handcuffed and was compliant. *Id.* Furthermore, denying qualified immunity to the defendants, the court wrote that "a reasonable officer could not possibly have believed that he then had the lawful authority to take her to the back of her car and slam her head against the trunk after she was arrested, handcuffed, and completely secured, and after any danger to the arresting officer as well as any risk of flight had passed." *Id.* at 1299.

As Nasseri argues, *Lee*'s analysis applies to Little. (Doc. 22 at 11.) While it is true that the current facts somewhat parallel those in *Lee* in that Nasseri was secured by handcuffs and sitting in a chair and that he was not attempting to flee, there is one critical difference. Unlike *Lee*, where the plaintiff was secured and there

25

was no other external threat to the officer, the officers at the Athens jail still faced the very real threat of violence.  Millward had been attacked by another arrestee only minutes before Nasseri was sprayed and, in attempting to assist Millward, Officer Jarrett was attacked by yet another arrestee in the booking room.   Given the events immediately preceding the time that Little sprayed Nasseri, there was still a substantial threat of danger to the understaffed officers, who were attempting to maintain order in an overcrowded jail.  Therefore, *Lee* is distinguishable from this case.

The same can be said for Nasseri's argument that the Eleventh Circuit's decision in *Vinyard v. Wilson* established that the current facts amount to a Fourth Amendment violation.  (Doc. 22 at 10.)  In *Vinyard*, the plaintiff was arrested at a party and was driven to the police station by the defendant.  En route to the station, the defendant stopped on a secluded road, opened the plaintiff's door and sprayed her in the face with pepper spray.  *Id.* at 1343-1344.  The plaintiff had been secured in handcuffs, kept her feet on the floor and presented no threat to the officer.  *Id.* Based on these facts, the Eleventh Circuit held that "it is abundantly clear . . . that during the jail ride [the defendant] used force that was plainly excessive, wholly unnecessary, and, indeed, grossly disproportionate under *Graham*."  *Id.* at 1349.  The plaintiff posed no threat to the officer, was secured in the rear of the car, and it was only a

short ride to the jail.  *Id.*

*Vinyard* also does not apply to the current case.  At the time when Little sprayed Millward, although Nasseri was secure, there was still a threat to the officers. Minutes before the incident, two officers had been attacked.  Little did not need to wait to determine whether Nasseri too might enter into the fray, even though he was handcuffed at the time and had only spoken to Little. In *Vinyard*, there was no explanation for the defendant's conduct.  The officer and the plaintiff were alone, the plaintiff was secured in the back seat of a police car, and there was no threat of violence.  This was simply not the situation that Little encountered in the instant case.

Additionally, the Eleventh Circuit's most recent pronouncements do not apply to the instant case.  In *Galvez v. Bruce*, --- F.3d ----, 2008 WL 5246102 (11th Cir. Dec. 18, 2008), the court denied qualified immunity to an officer who repeatedly slammed a handcuffed, compliant arrestee into a wall multiple times and with such force that the arrestee suffered severe pain.  Slip Op. at 5.  The plaintiff was not resisting arrest and only spoke to the officer, questioning why he was being harmed. *Id.*  The court found that there was a Fourth Amendment violation, relying primarily on the fact that there was no threat to the officer and that the plaintiff was being compliant.  *Id.* at 10-11.  Finding a constitutional violation, the court also denied qualified immunity on the ground that *Lee* presented a materially similar case, since

27

the court there had denied qualified immunity when the plaintiff "posed no threat at all to the officer or to anyone else and no risk of flight." *Id.* at 13 (quoting *Lee*, 284 F.3d at 1198).   As previously stated in this Court's discussion of *Lee* and *Vinyard*, the reasoning in *Galvez* does not apply because the officers at the jail <u>did</u> face a threat, even though Nasseri may have appeared to be compliant; his disruption could have escalated the violent circumstances faced by Little.  At the time he acted, Little had no time to ascertain the level of threat that Nasseri posed.  Thus, the dangerous situation that the officers faced in this case completely changes the Fourth Amendment analysis and makes *Galvez* inapplicable.

Therefore, as directed by the Eleventh Circuit in *Crosby*, 394 F.3d at 1333,  this Court will not second-guess the split-second decision of Little, who had to instantly determine whether Nasseri might try to become violent, even though handcuffed, since two individuals had become violent in the same booking room only moments before.  Thus, the Court finds that Little did not violate Nasseri's Constitutional rights when he used pepper-spray to subdue Nasseri in a situation that might have developed into a full-scale riot had the officers not acted.[4]

---

[4]   Out of an abundance of caution, the Court has also reviewed Little's conduct under a Fourteenth Amendment excessive force standard, which would apply if Nasseri were a pretrial detainee. *See Bozeman v. Orum*, 422 F.3d 1265, 1271 (11th Cir. 2005).  Under this standard, the Court must determine whether Little's conduct "shocks the conscience." *Cockrell*, 510 F.3d at 1311.  The shocks the conscience test requires the Court to look to the need for force, the relationship between that need and the amount of force used, and the extent of the injury. *See*

b.    *Alternatively, Little is entitled to qualified immunity.*[5]

Although the Court finds that Little did not violate Nasseri's rights under the Fourth Amendment, it alternatively finds that even if Little did violate Nasseri's rights, Little is nonetheless entitled to qualified immunity. Even if there were a constitutional violation, "qualified immunity is appropriate in close cases where a reasonable officer could have believed that his actions were lawful." *Lee*, 284 F.3d at 1199; *see also Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997) ("[U]nless a controlling and factually similar case declares the official's conduct unconstitutional, an excessive-force plaintiff can overcome qualified immunity only by showing that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw.").  The inquiry into whether a constitutional right was clearly established, "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Vinyard*, 311

---

*Danley*, 540 F.3d at 1307 (citing *Whitley v. Albers*, 475 U.S. 312, 321 (1986)). Additionally, the Court looks to the extent of the threat to the safety of staff and inmates and any efforts made to temper the severity of the forceful response. *Id.*  Force is necessarily excessive if it was applied "maliciously and sadistically for the very purpose of causing harm." *Cockrell*, 510 F.3d at 1311. Applying this more difficult standard, the Court finds that Little's use of pepper spray does not shock the conscience in the event that Nasseri is considered a pretrial detainee.

[5]  The Court recognizes that qualified immunity is not a defense to a Fourteenth Amendment excessive force claim. *See* n. 5, *infra*.

F.3d at 1349 (quoting *Saucier*, 533 U.S. at 201). The relevant dispositive inquiry is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," or whether the state of the law "gave [Little] fair warning that [his] alleged treatment of [Nasseri] was unconstitutional." *Al-Amin v. Smith*, 511 F.3d 1317, 1324-1325 (11th Cir. 2008) (quoting *Saucier*, 533 U.S. at 202; *Hope*, 536 U.S. at 741). "[A] a high degree of factual similarity with conduct previously held unlawful and unconstitutional is required to give a reasonable official fair and clear warning (or notice) that his particular conduct is unlawful and unconstitutional." *Id.* at 1335-1336. "[I]f the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Vinyard*, 311 F.3d at 1350. The Court has already discussed the two Eleventh Circuit cases relied upon by Nasseri, *Lee* and *Vinyard,* in attempting to prove that Little violated his constitutional rights, and the Court recognized that these cases are distinguishable from the instant case in that the defendants did not face the same volatile circumstances that Little faced when he sprayed Nasseri. Thus, neither *Lee* nor *Vinyard* are controlling and factually similar cases. Similarly, this is not a case where the conduct lies "so obviously at the very core of what the Fourth Amendment prohibits." *Smith*, 127 F.3d at 1419. Nasseri bears the burden of proving that Little is not entitled to qualified immunity. *Durruthy*

30

*v. Pastor*, 351 F.3d 1090, 1087 (11th Cir. 2003).  Having failed to provide sufficient evidence, the Court finds that even if there were a constitutional violation, Nasseri cannot demonstrate that Little violated clearly established law.

> 3.   Millward

_____a.   *Millward did not violate Nasseri's constitutional rights.*

As to Millward, Nasseri makes a different argument.  He maintains that Millward "continued the application of force by refusing to decontaminate Nasser by confining him in a police car for over an hour despite Nasseri's pleas." (Doc. 22 at 12.)  In making this argument, Nasseri appears to abandon his argument that the Fourth Amendment applies.  He cites no cases applying the Fourth Amendment to the current facts, but instead only makes comparisons to a case addressing a Fourteenth Amendment excessive force claim, *Danley v. Allen*.

In *Danley,* the Eleventh Circuit found that "the use of force in the form of extended confinement in the small, poorly ventilated, pepper spray-filled cell, when there were readily available alternatives, was excessive."  540 F.3d at 1309.  The plaintiff in *Danley* had failed to obey orders by a jailer and was pepper-sprayed as a result.  *Id.* at 1304.  When the plaintiff began choking, he was mocked by the jailers and forced to sit in an unventilated cell for twenty minutes before being allowed to briefly rinse himself.  *Id.*  The jailers refused medical treatment for several hours

thereafter, even though the plaintiff requested it numerous times.  *Id.* at 1305.

Applying the Fourteenth Amendment excessive force standard, the Eleventh Circuit

found that the jailers acted "maliciously and sadistically for the very purpose of

causing harm." *Id.* at 1309.

Since the Court has already determined that the Fourth Amendment applies to

Nasseri's detention in the police car, the analysis in *Danley* does not apply.  The

Court's own research has uncovered no Fourth Amendment cases that parallel the

current facts, but applying the Eleventh Circuit's Fourth Amendment objective

reasonableness test, which depends on "the severity of the crime, the danger to the

officer, and the risk of flight," the Court finds that the Millward's actions do not

amount to a constitutional violation of the Fourth Amendment.

Nasseri himself admits that Millward initially placed him in the car so that he

could take him to the county jail, due to the overcrowding in the Athens facility.

(Doc. 19, Al. Nasseri Dep. at 111:12-20.)   While Nasseri remained in the car,

Millward's attention was necessarily directed to the eleven other prisoners, who had

all been evacuated from the facility and were seated together against the wall of the

prison.  In the moments that preceded the need to bring all of the prisoners outside,

two officers had been attacked.  Also, prior to the incident, several other prisoners

had been taunting and arguing with Millward.  (Doc. 19, Ab. Nasseri Dep. at 64:16-

32

65:17.)

In these circumstances, the understaffed officers were in the vulnerable position of having all prisoners outside; thus, it is understandable that Millward did not take time to personally escort Nasseri to the hose to decontaminate himself, as the other prisoners were able to wash themselves due to their proximity to a hose. Thus, the Court finds that Millward did not violate Nasseri's rights under the Fourth Amendment.

Alternatively, even if this Court applied the Fourteenth Amendment's excessive force standard to Nasseri's conduct, which Nasseri has argued does not apply but has cited cases supporting a Fourteenth Amendment excessive force argument, the Court would not find that Millward's conduct shocked the conscience. Under the Eleventh Circuit's excessive force standard for the Fourteenth Amendment, the Court looks to (1) the need for force, (2) the relationship between that need and the amount of force used, (3) the extent of the injury (4) the extent of the threat to the safety of staff and inmates, and (5) any efforts made to temper the severity of the forceful response. *See Danley*, 540 F.3d at 1307 (citing *Whitley* 475 U.S. at 321. Force is necessarily excessive if it was applied "maliciously and sadistically for the very purpose of causing harm." *Cockrell*, 510 F.3d at 1311.

The sole case cited by Nasseri in support of his Fourteenth Amendment

33

argument (couched in Fourth Amendment terms) is *Danley*.  However, *Danley* is distinguishable from this case.  In *Danley* the prison officials did not face the same exigent circumstances as did Millward.  All of the prisoners in *Danley* were secure and in their cell; there was no imminent threat of violence.  Furthermore, the officials in *Danley* made it a point to mock the plaintiff, which the court considered "circumstantial evidence of their malicious intent."  540 F.3d at 1309.  The *Danley* court relied on the fifth *Whitley* factor, which considers the efforts made to temper the severity of the response.   *Id.* at 1308. Although Millward did raise the window between the front and rear portions of the car, this conduct does not demonstrate the same evidence of "malicious intent" as was the case in *Danley*, especially given that Nasseri had been kicking the car's windows.  Additionally, Millward's statement to Nasseri's son that the air conditioning was running, indicates that Millward <u>believed</u> Nasseri was being provided ventilation, although Millward could not later recall whether the air-conditioning was actually on in the car.  (*See* Doc. 19, Ab. Nasseri Dep. at 55:5-8.)

Unlike *Danley*, Millward did not mock Nasseri; rather, he did not permit him to wash his face when faced with the difficult circumstance of maintaining order in a possible crisis situation.  Considering these difficult and chaotic circumstances, the Court does not find that Millward acted maliciously and sadistically for the very

purpose of causing harm.  The conduct at issue here does not rise to the same shocking level of cruelty as in *Danley*; thus, even if the court applied the Fourteenth Amendment's excessive force standard, summary judgment is therefore due to be granted.

> b.    *Alternatively, Millward is entitled to qualified immunity.*

Alternatively, the Court finds that even if Millward violated Nasseri's Fourth Amendment rights, he is nevertheless entitled to qualified immunity.[6] As he did with respect to Little, Nasseri argues that *Lee* and *Vinyard* each establish "that an unjustified use of pepper spray on an arrestee who is not a danger to the officer or a flight risk is unconstitutional."  (Doc. 22 at 13.)   Accordingly, he argues that Millward is not entitled to qualified immunity. *Id.  Lee* and *Vinyard*, previously discussed in the section C.2 of this opinion (regarding Plaintiff's claims against Little), did not put Millward on notice that detaining an arrestee who had already been sprayed violated the Fourth Amendment.  In *Lee*, the court denied qualified immunity to an officer who slammed the head of a secured arrestee into the trunk of

---

[6] Qualified immunity does not apply to a Fourteenth Amendment excessive force claim, since "there is no room for qualified immunity" in Fourteenth Amendment excessive force cases because it requires "a subjective element that is so extreme that no reasonable person could believe that his actions were lawful."  *Danley*, 540 F.3d at 1310 (quoting *Johnson v. Breeden*, 280 F.3d 1308, 1321-1322 (11th Cir. 2002)).  However, when the Court alternatively applied the Fourteenth Amendment to Plaintiff's excessive force claims, it still found no constitutional violation and therefore both Little and Millward are entitled to summary judgment.

a car.  284 F.3d at 1299.  In *Vinyard*, the court denied qualified immunity when the defendant sprayed an arrestee who was secured in the police car, while there was <u>no</u> other threat of violence.  311 F.3d at 1349.  Neither of these cases were sufficient to put Millward on notice that failing to decontaminate Nasseri during the difficult circumstance of a jail evacuation violated the Fourth Amendment.  Furthermore, to the extent that *Danley* can be read as establishing a Fourth Amendment right rather than a Fourteenth Amendment right (the Court does not believe that *Danley* can be read in this manner), it is a case that was decided only in 2008 and was therefore not available to Millward at the time he acted (in 2005).  Finally, this is not a case where the conduct obviously falls at the core of what the Fourth Amendment prohibits.  *Smith*, 127 F.3d at 1419.  Therefore, the Court finds that Nasseri has not met his burden of proving that Millward violated clearly established law and, if the Court alternatively found that Millward violated the Fourth Amendment by detaining Nasseri, he would nevertheless be entitled to qualified immunity.

Thus, the defendants' motion is due to be **GRANTED** as to each of the excessive force claims.  The Court finds that neither Little nor Millward violated Nasseri's constitutional rights, and it alternatively finds that neither violated clearly established law.  Having determined that Millward and Little are entitled to summary judgment on the excessive force claims, the Court turns to the sole remaining

36

claim–that of deliberate indifference, which is asserted only against Millward.

**D.     Deliberate Indifference**

1.     <u>Millward did not violate Nasseri's constitutional rights.</u>

"Deliberate indifference to a prisoner's serious medical needs is a violation of the Eighth Amendment," but "[t]echnically, the Fourteenth Amendment Due Process Clause, not the Eighth Amendment prohibition on cruel and unusual punishment, governs pretrial detainees." *Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007) (citing *Snow v. City of Citronelle, Ala.*, 420 F.3d 1262, 1268 (11th Cir.2005)). "However, the standards under the Fourteenth Amendment are identical to those under the Eighth." *Id.* (citing *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1115 (11th Cir.2005)).

> In order to prove deliberate indifference a prisoner must shoulder three burdens. First, she must satisfy the objective component by showing that she had a serious medical need. *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir.2005) (*per curiam*). Second, she must satisfy the subjective component by showing that the prison official acted with deliberate indifference to her serious medical need. *Id.* Third, as with any tort claim, she must show that the injury was caused by the defendant's wrongful conduct.

510 F.3d at 1326.

"There are at least two different tests for whether a medical need is serious." *Danley,* 540 F.3d at 1310 (citing *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176,

37

1187-88 (11th Cir.1994), *overruled in part on other grounds by Hope*, 536 U.S. at 739 n. 9).  Under one test, the question is whether a delay in treatment worsens the condition.  *Id.* at 1310.  The other measure is whether the need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* at 1310-1311.

As in *Danley*, the Court finds that the first part of the deliberate indifference test, the objective component, is satisfied.  In *Danley*, in closely similar factual circumstances, the Court concluded that both tests were satisfied.  First, it is clear that based on the facts established for the purpose of this motion, Nasseri's condition worsened the longer he was not permitted to be decontaminated.  (Doc. 119, Al. Nasseri Dep. at 124-125.)  Thus, the first test used in *Danley* is satisfied.  The second test in *Danley* is also satisfied.  The plaintiff in *Danley* "had difficulty breathing, [] his eyes burned and became so swollen he could hardly see, and that more than twelve hours after he had been sprayed he nearly blacked out as a result of all his breathing problems."  540 F.3d at 1311.  Nasseri also had watering eyes, was coughing, had difficulty breathing, and was spitting profusely.  (Doc. 119, Al. Nasseri Dep. at 125:1-6.)  Thus, as the court found in *Danley*, Nasseri also had a serious medical condition that a even a lay person would easily recognize as requiring the

attention of a doctor. *Id.* at 1311-1312. Having established the objective component of the deliberate indifference test, the Court now turns to the subjective component.

"To satisfy the subjective element of deliberate indifference to [a plaintiff's] serious medical need, [the plaintiff] must prove three things: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." *Bozeman*, 422 F.3d at 1272 (quoting *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004)). "Demonstration of the level of subjective knowledge necessary to impute to the Officers a sufficiently blameworthy state of mind consists of two steps: the Officers must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and must also draw the inference." *Id.*

In *Bozeman*, the court concluded that circumstantial evidence would permit the jury to infer that officers knew that a prisoner was unconscious and not breathing when they carried him to a cell, although no officer had specifically admitted to this fact. *Id.* at 1273. The Court draws a similar inference here. The residue from the pepper spray was visible on Nasseri's face, he was coughing and gagging, and the fact that all other prisoners, including those who were not even in the same room as the pepper spray, were decontaminated, all indicate that Millward knew that it would be appropriate to decontaminate Nasseri, regardless of whether he actually saw

39

Nasseri sprayed.  He must have known that Nasseri was suffering from his exposure to the spray.

Turning to the next factor of the subjective component, Millward disregarded the risk of serious harm when he failed to allow the wheezing and choking Nasseri to decontaminate himself during the time that he was locked in the car.  Thus, two of the three subjective component factors fall in Nasseri's favor.

However, the third factor, conduct that is more than gross negligence, does not fall in Nasseri's favor.  Again, Nasseri argues that the facts in his case are comparable to those in *Danley*, where the court found that the jailers did act with deliberate indifference to the plaintiff's obvious medical needs.  There, the court quoted *Bozeman* in finding that the jailers acted with more than gross negligence, concluding, "[w]hen prison guards ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference."  *Id.* at 1312 (emphasis added).  Here, however, there is an explanation for Millward's conduct.  As the Court has repeated throughout this opinion, Millward faced a very chaotic and unusual situation in which all of the prisoners in his jail had been evacuated, there were only a few officers outside with him, two of the officers had been attacked, separately, by the arrestees just a few minutes prior to the evacuation, and Millward intended to take Nasseri to the county

40

jail, where there was more space, although he ultimately did not do so.  Unlike

*Danley*, where there was no explanation for failing to provide adequate medical care,

and the jailers instead went out of their way to mock the plaintiff, *see* 540 F.3d at

1313, Millward has a reasonable explanation for failing to provide Nasseri with

adequate medical care.

At the very worst, the Court finds that his conduct was  only grossly negligent

and does not rise to the level of more than gross negligence, as required by the

Eleventh Circuit.  Therefore, the Court finds that there is no Fourteenth Amendment

deliberate indifference violation.

### 2.    Alternatively, Millward is entitled to qualified immunity.

Even if there were a constitutional violation, Millward would still be entitled

to qualified immunity.  Although *Danley* denied qualified immunity to the jailers, it

did not rely on cases with materially similar facts, but denied qualified immunity by

looking to "general legal principles."  540 F.3d at 1313.  Crucial to its finding that

general legal principles established that the rights were clearly established was the

fact that the complaint alleged that the jailers "took only ineffective measures to

remedy the need and then mocked [the plaintiff] and ignored his pleas for help."  *Id.*

Here, during the time that Nasseri was detained in the car, Millward did not mock

Nasseri, but instead focused his attention on the other prisoners who were not

41

detained in a car, while keeping an eye on Nasseri at the same time. (Doc. 118, Millward Dep. at 188:21-192:15.)  Other prisoners were yelling, and the atmosphere was chaotic.  (Doc. 23, Parnell Dep. at 23:17-19.)  Thus, the general legal principles that applied in *Danley* do not apply to Nasseri's case and, had a constitutional violation occurred, the law was not clearly established at the time Millward acted.

Consequently, the Motion for Summary Judgment is due to be **GRANTED** as to the deliberate indifference claim against Millward.  In failing to decontaminate Nasseri, Millward did not violate Nasseri's constitutional rights, and he alternatively did not violate clearly established law.

## IV.   CONCLUSION

For the reasons discussed in this Memorandum Opinion, the Court finds that the Defendants' Motion for Summary Judgment is due to be **GRANTED**.  The Court has found that the facts do not establish a constitutional violation under any of the theories claimed by Nasseri and that, alternatively, the individual Defendants did not violate clearly established law.  An Order will be entered concurrently with this Memorandum Opinion.

**DONE** and **ORDERED** this the 19th day of February, 2009.

**VIRGINIA EMERSON HOPKINS**
United States District Judge